REDACTED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

**ARAMARK SERVICES, INC., ARAMARK UNIFORM AND CAREER APPAREL, INC., ARAMARK EMPLOYEE WELFARE BENEFIT PLAN, ARAMARK UNIFORM SERVICES EMPLOYEE WELFARE BENEFIT PLAN; ARAMARK SERVICES, INC. GROUP HEALTH PLAN, ARAMARK UNIFORM SERVICES HEALTH AND WELFARE PLAN, ARAMARK BENEFITS COMPLIANCE REVIEW COMMITTEE;**

**WHIRLPOOL CORPORATION WELFARE BENEFITS COMMITTEE, WHIRLPOOL CORPORATION, WHIRLPOOL CORPORATION GROUP BENEFIT PLAN, AND WHIRLPOOL CORPORATION GROUP BENEFIT PLAN FOR RETIREES;**

**W.W. GRAINGER, INC., W.W. GRAINGER, INC. GROUP BENEFIT PLAN I, W.W. GRAINGER, INC. GROUP BENEFIT PLAN II;**

**KRAFT HEINZ FOODS COMPANY, KRAFT HEINZ COMPANY GROUP BENEFITS PLAN KRAFT HEINZ COMPANY RETIREE GROUP BENEFITS PLAN; THE KRAFT HEINZ COMPANY EMPLOYEE BENEFITS ADMINISTRATION BOARD;**

**RALPH LAUREN CORPORATION, RALPH LAUREN CORPORATION EMPLOYEE BENEFIT PLAN;**

**STERLING JEWELERS, INC., STERLING JEWELERS, INC. EMPLOYEE BENEFIT PLAN; STERLING JEWELERS, INC. HEALTH & WELFARE BENEFITS COMMITTEE;**

**Plaintiffs,**

**v.**

**UNITED HEALTH GROUP INCORPORATED; HEALTHSCOPE BENEFITS, INC., UNITED HEALTHCARE SERVICES, INC.; UNITED**

**No. 2:26-cv-00949**

**COMPLAINT**

**JURY TRIAL DEMAND**

REDACTED

**MEDICAL RESOURCES, INC.; UNITEDHEALTHCARE SERVICE LLC; UNITED HEALTHCARE INSURANCE COMPANY,**

**Defendants.**

Plaintiffs Aramark Services, Inc.; Aramark Uniform and Career Apparel, Inc.; Aramark Employee Welfare Benefit Plan; Aramark Uniform Services Employee Welfare Benefit Plan; Aramark Benefits Compliance Review Committee; Whirlpool Corporation; Whirlpool Corporation Welfare Benefits Committee; Whirlpool Corporation Group Benefit Plan; Whirlpool Corporation Group Benefit Plan for Retirees; W.W. Grainger, Inc.; W.W. Grainger Inc., Group Benefit Plan I; W.W. Grainger Inc., Group Benefit Plan II; Kraft Heinz Foods Company; Kraft Heinz Company Group Benefits Plan; Kraft Heinz Company Retiree Group Benefits Plan; The Kraft Heinz Company Employee Benefits Administration Board; Ralph Lauren Corporation; Ralph Lauren Corporation Employee Benefit Plan; Sterling Jewelers, Inc.; Sterling Jewelers, Inc. Employee Benefit Plan; and Sterling Jewelers, Inc. Health & Welfare Benefits Committee (collectively "Plaintiffs") submit this Complaint against Defendants United Health Group; United HealthCare Services, Inc. ("United Healthcare"); UnitedHealthCare Service LLC; United HealthCare Insurance Company; Healthscope Benefits, Inc. ("Healthscope"); and United Medical Resources Inc. ("UMR") (collectively "United" or "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1. Since at least 2020, United has served as the Third Party Administrator ("TPA") of Plaintiffs' medical benefits plans through which they provide medical coverage to their employees, retirees, and their families (the "Plans" and such covered individuals, "Plan Participants"). As

TPA, United was entrusted with, among other things, the responsibility of paying doctors, hospitals, and other medical providers for medical services provided to Plaintiffs' employees, retirees, and their families. As such, United was and is a fiduciary under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101 *et seq.* ("ERISA"). Plaintiffs now know and understand that United breached its duties and obligations to Plaintiffs. Plaintiffs determined that United routinely caused Plaintiffs to use Plan assets to pay improper, false, and fraudulent claims and to overpay claims. United also misused Plan assets and charged Plaintiffs for excessive, unreasonable, and undisclosed fees.

2. Plaintiffs, like other large employers, "self-fund" their medical benefits Plans. Unlike traditional insurance arrangements where an employer pays premiums to a health insurance company and the health insurer assumes the financial risk of employees' medical claims, employers that self-fund medical benefits retain the financial risk and are responsible for the payment of healthcare procedures. Plaintiffs, however, lack the expertise to administer the details of a medical benefits plan such as interacting with healthcare providers, processing provider claims for payment, determining how much providers should be paid from plan assets, screening for false, fraudulent, or improper claims, and remedying overpayments. Plaintiffs delegated this crucial fiduciary responsibility to United, Plaintiffs' TPA, and United accepted this obligation. Since 2020, Plaintiffs entrusted United with [redacted] Plan assets.

3. United owed contractual, fiduciary, and statutory duties to properly adjudicate and pay claims and to prevent fraud, waste, and abuse. As Plaintiffs' TPA, United committed to pay properly adjudicated claims from Plaintiffs' Plan assets through duly granted authority, as ERISA requires. United owed Plaintiffs an affirmative duty under ERISA to exercise "care, skill, prudence and diligence" in properly paying claims, as well as identifying and denying fraudulent,

improper, or otherwise illegitimate claims. 29 U.S.C. § 1104. United should have preserved Plaintiffs' Plan assets for the benefit of Plaintiffs' Plan Participants and only used those assets to pay legitimate claims for healthcare services rendered to Plan Participants. In practice, however, United abused its authority to enrich itself to Plaintiffs' detriment. United's failure to perform these basic obligations breached its fiduciary duties and contractual obligations.

4. In addition, United engaged in prohibited transactions. United took Plan assets and other funds from Plaintiffs under the guise of claims administration, transferred the money to accounts under United's control, commingled Plan assets with those of other plans, paid a portion of that money to providers to settle the claims, and kept the difference. United never refunded or credited the difference to the Plaintiffs' Plans.

5. United also took steps to conceal its myriad breaches of fiduciary and contractual obligations. For example, United limited Plaintiffs' audit rights and provided inaccurate, and in some instances misleading, reporting. Combined, these actions made it impossible for Plaintiffs to obtain or access data about the actual financial transactions among Plaintiffs, United, and the providers.

6. United's breaches of contract and fiduciary duties have collectively cost Plaintiffs millions of dollars. Plaintiffs bring this action to address the harm caused by United's wrongful conduct and to enjoin United from continuing to engage in this wrongful conduct to Plaintiffs' detriment.

## PARTIES

7. Plaintiff Aramark Services, Inc. is a Delaware corporation with its principal place of business located at 2400 Market Street, Philadelphia, Pennsylvania 19103. Along with its affiliate, Aramark Uniform and Career Apparel, Inc., Aramark sponsors the Aramark Employee Welfare Benefit Plan and Aramark Uniform Services Employee Welfare Benefit Plan, welfare

benefit plans organized and governed by ERISA. Aramark Benefits Compliance Review Committee was established by Aramark Services, Inc. to act as the plan administrator and designated ERISA fiduciary for the above Plans in addition to the Aramark Services, Inc. Group Health Plan and Aramark Uniform Services Health and Welfare Plan. “Aramark” shall refer to all Aramark entities referenced in this paragraph.

8. Plaintiff W.W. Grainger, Inc. is an Illinois corporation with its principal place of business in Lake Forest, Illinois. W.W. Grainger sponsors the W.W. Grainger, Inc. Group Benefit Plan I and the W.W. Grainger, Inc. Group Benefit Plan II, welfare benefit plans organized and governed by ERISA. “Grainger” shall refer to all W.W. Grainger entities referenced in this paragraph.

9. Plaintiff Kraft Heinz Foods Company is a Pennsylvania limited liability company. Its sole member is Kraft Heinz Intermediate Corporation II, which is a Delaware corporation with its principal place of business in Chicago, Illinois. Kraft Heinz sponsors the Kraft Heinz Company Group Benefits Plan and the Kraft Heinz Company Retiree Group Benefits Plan, welfare benefit plans organized and governed by ERISA. The Kraft Heinz Company established The Kraft Heinz Company Employee Benefits Administration Board to act as administrator and fiduciary of the Plans. “Kraft Heinz” shall refer to all Kraft Heinz entities referenced in this paragraph.

10. Plaintiff Ralph Lauren Corporation is a Delaware corporation with its principal place of business in New York, New York. Ralph Lauren sponsors the Ralph Lauren Corporation Employee Benefit Plan, a welfare benefit plan organized and governed by ERISA. “Ralph Lauren” shall refer to all Ralph Lauren entities referenced in this paragraph.

11. Plaintiff Sterling Jewelers, Inc. is a Delaware corporation with its principal place of business located at 375 Ghent Road, Akron, Ohio 44333. Along with its parent company, Signet

Jewelers Ltd., Sterling Jewelers sponsors the Sterling Jewelers, Inc. Employee Benefit Plan, a welfare benefit plan organized and governed by ERISA. Sterling Jewelers, Inc. Health & Welfare Benefits Committee was established to act as the administrator and named ERISA fiduciary for Sterling Jeweler's welfare benefit Plans. "Sterling Jewelers" shall refer to all Sterling Jewelers entities referenced in this paragraph.

12. Plaintiff Whirlpool Corporation is a Delaware corporation with its principal place of business in Benton Harbor, Michigan. Whirlpool is a leading kitchen and laundry appliance company with 55 manufacturing and technology research centers around the world. Whirlpool sponsors the Whirlpool Corporation Group Benefit Plan and Whirlpool Corporation Group Benefit Plan for Retirees, welfare benefit plans organized and governed by ERISA. Whirlpool Corporation Welfare Benefits Committee was established to act as the administrator and named ERISA fiduciary for Whirlpool Corporation's welfare benefit Plans. "Whirlpool" shall refer to all Whirlpool entities referenced in this paragraph.

13. Defendant United Health Group is a Delaware corporation with principal places of business in Eden Prairie, Minnesota and Washington, DC.

14. Defendant United HealthCare Services, Inc. is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota, and is a direct subsidiary of United Health Group. It provides administrative services to United's clients, including Plaintiffs.

15. Defendant UnitedHealthcare Service LLC is a Delaware limited liability company with its principal place of business in Minnetonka, Minnesota.

16. Defendant United Healthcare Insurance Company is a Minnesota corporation with its principal place of business in Hartford, Connecticut.

17. Defendant Healthscope Benefits, Inc. is a Delaware corporation with a principal place of business in Little Rock, Arkansas.[1] United Medical Resources, Inc. acquired Healthscope Benefits, Inc. on or about April 4, 2019.

18. Defendant United Medical Resources, Inc. ("UMR") is a Delaware corporation headquartered in Wausau, Wisconsin. UMR is a subsidiary of United Health Group. According to United, "UMR is the nation's largest [TPA], serving more than 3,800 benefits plans and their 6 million members."[2]

19. At all relevant times, Defendants acted in concert and as agents of each other. United has disclosed that certain, unidentified services were or will be provided to Plaintiffs by certain, unidentified affiliates or subcontractors. Such undisclosed services may require the affiliates to possess or control Plaintiffs' confidential information, Plaintiffs' medical claim information, or Plaintiffs' assets. Based on the limited information available to Plaintiffs, on information and belief, Plaintiffs allege that all named Defendants engaged in, approved, participated in, and failed to intervene to prevent the conduct alleged in this Complaint.

## JURISDICTION AND VENUE

20. Pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331, this Court has jurisdiction over the claims asserted in this Complaint.

21. The Court has personal jurisdiction over United because, at all times relevant to the claims asserted herein, United conducted business in the State of Texas within the meaning of the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042. United's contacts with the State of Texas include, but are not limited to:

---

[1] Healthscope served as the third-party claims administrator for Whirlpool's Plans only and is named as a Defendant solely in connection with its administration of the Whirlpool Plans.

[2] *About UMR*, UMR, https://www.umr.com/about-umr (last visited October 15, 2026).

a. As of 2023, the Texas Department of Insurance reported that United was the second largest insurer in the State with a market share of 9.51% and reported premium intake of $5,718,716,067. Neither the market share nor premium revenue includes the market share or premiums of other companies that may be affiliated with United.

b. United has multiple offices in Texas.

c. United has contractual relationships with thousands of doctors, hospitals, and other healthcare providers that render care to patients in Texas and the District, ranging in size from large hospital systems to single-doctor practices.

d. United provides medical benefits coverage to hundreds of thousands of families and individuals who reside in Texas and in the District.

e. United has contractual relationships with hundreds of employers and plan sponsors that are based in, operating in, have employees working in, or have employees residing in Texas and in the District.

f. United provides and has provided medical benefits coverage to Plaintiffs' employees and their families in Texas and in the District.

22. By agreeing to contract, adjudicate, and transmit payment for medical treatment of Plaintiffs' employees, retirees, and beneficiaries residing in Texas, and for medical services rendered in Texas, United has purposefully availed itself of the privilege of conducting business within Texas. Over a 40-month period, United processed thousands of claims for payment submitted to United by Texas medical providers that cared for Plaintiffs' Plan Participants.

23. United previously filed complaints and prosecuted claims in this District. United has been sued in this District and did not object to jurisdiction or venue.

24. Each Plaintiff maintains significant business operations in Texas and employs a substantial workforce in the State of Texas. Plaintiffs' Texas employees receive medical benefits coverage administered by United. Plaintiffs' employees have received care, treatment, and services from both in-network and out-of-network healthcare providers in this District.

25. For the reasons stated above, venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2).

## BACKGROUND

### A. Plaintiffs Entrusted United with the Administration of the Plans

26. Plaintiffs lack the expertise to evaluate claims for payment submitted by healthcare providers that cared for its Plan Participants—a process called claims adjudication. Plaintiffs contracted claims adjudication responsibility to United in exchange for significant compensation. Prior to contracting with United, Plaintiffs each conducted a competitive request for proposal and bid process. During those processes, United made representations regarding its competence and expertise to Plaintiffs' employees and committee members responsible for hiring a health insurance company to act as a claims administrator and to act as a claim fiduciary. United represented it had expertise in evaluating claims for payment submitted by providers for adherence to: (i) the Plans' coverage and reimbursement policies, and (ii) industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services ("CMS") and the American Medical Association ("AMA").

27. As a TPA, United did not provide traditional medical insurance to Plaintiffs' employees or retirees. United did not pay medical expenses incurred by Plan Participants in exchange for premiums. Rather, the financial risk of the cost of medical expenses incurred by Plan Participants did not shift to United. The cost of care incurred by Plan Participants is paid—as determined by United—from assets of the Plans. In other words, Plaintiffs self-funded employees' and certain retirees' medical expenses (with contributions from some employees in certain circumstances).

28. Plaintiffs entrusted United with [redacted] Plan assets since 2020 to pay claims submitted by healthcare providers for medical services rendered to Plan Participants.

REDACTED

29. In its capacity as Plaintiffs' TPA, United served as an ERISA fiduciary in three separate ways: as a named fiduciary, as a functional fiduciary, and as a fiduciary by way of control of Plan assets. Each of these independent bases for fiduciary status is addressed in turn below.

**B. United is a Named Fiduciary Under the Express Terms of the Plan Documents**

30. First, United is an ERISA fiduciary by "express designation by the ERISA plan documents." *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004) (quoting *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 543 (S.D. Tex. 2003)). In the agreements between each Plaintiff and United, United agreed to serve as a named ERISA fiduciary. For example, each agreement generally provides:

> [redacted]

[redacted]

---

[redacted]

[redacted].

31. United has also represented to judicial officers in other proceedings that, when acting as a TPA, United is an ERISA fiduciary. *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, Case No. CV 14-030353-MWF(VBKx), 2015 U.S. Dist. LEXIS 183365, at *62 (C.D. Cal., Oct. 23, 2015) ("United had made sufficient allegations as to its fiduciary status with respect to the plans at issue to confer it standing for its ERISA claim.").

**C. United is a Functional Fiduciary Because of Its Discretionary Authority**

32. Second, United's exercise of discretionary authority over benefit determinations, claims processing, approvals and denials of claims, and overpayment recovery renders United a functional fiduciary. *See Corcoran v. United Healthcare*, 965 F.2d 1321, 1330 n.13 (5th Cir. 1992) ("The parties [] agree that United is a fiduciary, and we have no reason to dispute this . . . [because] United's contract with [the plan sponsor] would appear to give it 'discretionary authority or discretionary control respecting management of the plan' or 'authority or control respecting management or disposition of its assets,' thus satisfying the statutory definition of a fiduciary." (cleaned up) (quoting 29 U.S.C. § 1002(21)(A)(i))); *see also LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs, Inc.*, 703 F.3d 835, 845 (5th Cir. 2013) ("Where a TPA exercises control over a plan's benefits claims process, and exerts that control to deny a claim by incorrectly interpreting a plan in a way that amounts to an abuse of discretion, liability may attach."); *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc.*, 841 F.2d 658, 662 (5th Cir.

1988) ("The term fiduciary includes those to whom some discretionary authority has been delegated."); *Burke v. Boeing Co.*, 42 F.4th 716, 725 (7th Cir. 2022) ("Functional fiduciaries might not be named in the plan document but still exercise 'discretionary control or authority over the plan's management, administration, or assets.'" (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993))). United's decision-making authority and discretion under the Agreements was not ministerial; United exercised discretion that went far beyond mere application and compliance with its own guidelines.

33. [redacted]

34. [redacted]

[redacted]

35. United exercised discretion with respect to recovery of overpayments on medical claims. [redacted].

36. Plaintiffs were entirely at United's mercy when it came to the administration, adjudication, processing, or payment of their claims. Plaintiffs had no role in United's decision to approve or deny claims, or in United's decision to pay any particular amounts for approved claims from Plan assets.

37. Plaintiffs relied on United to properly process, review, adjudicate, and pay claims for needed medical care. United was uniquely positioned to exercise such discretionary authority and control over Plan Assets, including the right to determine unilaterally the value of a fee or rate paid to a healthcare provider. United was also afforded and exercised broad flexibility in determining its course of action in administering the Plans.

**D. United is a Fiduciary By Way of its Control Over Plan Assets**

38. Third, United was also a fiduciary by virtue of its control over Plan assets. *See Mertens*, 508 U.S. at 251-52 ("[A]nyone [] who exercises discretionary control or authority over the plan's … assets … is an ERISA 'fiduciary.'"). [redacted]

[redacted]

39. "Plan assets" under ERISA include funds withheld from employee paychecks to pay for their medical benefits. "[T]he assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution…to the plan[.]" 29 C.F.R. § 2510.3-102(a)(1); *see also LoPresti v. Terwilliger*, 126 F.3d 34, 39–40 (2d Cir. 1997); *Chao v. Day*, 436 F.3d 234, 236–37 (D.C. Cir. 2006). Plaintiffs withheld such funds from their employees' paychecks and combined these funds with Plaintiffs' employer contributions to pay for their medical benefits, rendering these funds "plan assets" under ERISA.[4] United had direct access to these funds and control over these Plan assets.

[4] The fact that Plaintiff Kraft Heinz funds its Plans through stand-alone trusts, namely, the Kraft Heinz Company Retiree Health & Welfare Benefits Trust and the Kraft Heinz Company Group Benefit Trust, does not change the analysis. These trusts were established and funded with both employee paycheck withholdings and employer contributions to satisfy the liabilities of the Plans and Plan Participants, rendering these funds "plan assets" under ERISA. *See Bannistor v. Ullman*, 287 F.3d 394, 402 (5th Cir. 2002) (holding that employee contributions withheld from paychecks constitute "plan assets" under ERISA, even when commingled with employer's general assets); U.S. Dep't of Lab., Advisory Opinion 1994-31A (Sept. 9, 1994) ("[A] plan obtains a beneficial interest in particular property if, under common law principles, the property is held in trust for the benefit of the plan or its participants and beneficiaries[.]").

40. Plaintiffs relied on United to pull from the Plans only the amount of money for claims-related expenses that was actually paid to providers. However, United's automated claims processing system routinely approved and paid claims without meaningful human review. United's system was designed to process high volumes of claims as quickly as possible, resulting in the automatic approval and payment of claims that should have been flagged for further scrutiny, denied, or investigated for fraud. In most instances, United's wrongfully approved claims were paid almost immediately using Plan assets, with no substantive human oversight.

41. As demonstrated above, United is a fiduciary by virtue of its control over Plan assets. United had direct access to Plaintiffs' accounts and exercised its discretionary authority over those assets to approve and pay claims—including false, fraudulent, and improper claims—to Plaintiffs' detriment. Plaintiffs entrusted United to use Plan assets solely to pay legitimate claims, but United abused that trust by siphoning funds through undisclosed fees, overpaying its own affiliates, and failing to prevent the payment of improper claims. Notwithstanding its fiduciary obligations to [redacted]—which it does for claims under its own fully insured plan—United approved and paid millions of dollars of claims with the Plans' assets that never should have been paid. [redacted]

**E. United's Duties as an ERISA Fiduciary**

42. As an ERISA fiduciary, United was required to carry out the duties of undivided loyalty and of prudence. United failed in both respects.

43. "ERISA's duty of loyalty is the highest known to the law." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000) (internal quotations and citations omitted). Because of this, "ERISA fiduciaries must 'discharge [their] duties with respect to a plan solely in the interest

of the participants and beneficiaries.'" *Singh v. RadioShack Corp.*, 882 F.3d 137, 149 (5th Cir. 2018) (quoting 29 U.S.C. § 1104(a)(1)). To satisfy this duty, United was required to provide Plaintiffs with complete and accurate medical claims data so that Plaintiffs could monitor United's administration of the Plans. As discussed further below, by withholding complete medical claims data, engaging in self-dealing by overpaying its own affiliates, using cross-plan offsetting to benefit its fully insured plans, and extracting undisclosed and unreasonable fees from Plan assets, United prioritized its own interests over those of the Plans and their participants.

44. In addition, ERISA fiduciaries must use "care, skill, prudence, and diligence" in carrying out their duties. 29 U.S.C. § 1104(a)(1)(B); *see Kramer v. Smith Barney*, 80 F.3d 1080, 1083–84 (5th Cir. 1996). Under ERISA, a fiduciary "should exert at least that duty of care that a reasonably prudent person would exert in his own affairs under like circumstances," and "must exercise his position of trust so as, at the very minimum, not to harm the beneficiary as a result of his failure to exercise reasonable care." *Phillips v. Maritime Ass'n - I.L.A. Local Pension Plan*, 194 F. Supp. 2d 549, 555-56 (E.D. Tex. 2001). As a fiduciary of the Plans, United was required to satisfy this standard by identifying, denying, and preventing the payment of false, fraudulent, or improper provider-submitted claims or other claims that did not satisfy the eligibility and other requirements of the Plans. United did not.

## UNITED'S WRONGFUL CONDUCT[5]

### A. United Refused To Provide Medical Claims Data

45. As set forth above, United's duty of loyalty required it to act solely in the interest of Plan Participants and beneficiaries. A critical component of that duty was providing Plaintiffs

[5] These allegations are generally applicable to United's business practices but may not be relevant to all Plaintiffs in every instance.

with complete and accurate medical claims data so that Plaintiffs could verify United was properly administering the Plans. United breached this duty by withholding, manipulating, and corrupting the claims data that belonged to Plaintiffs. Federal regulations require that participants in the healthcare system, *e.g.*, providers, health plans, and insurers, exchange information regarding enrollment, eligibility, billing, claim status, adjustments, adjudication, and payment using specifically defined electronic data sets. Yet, United failed to provide all Plaintiffs with industry-standard claims data and failed to provide other Plaintiffs with any claims data whatsoever. Claims processing and payment is governed by the Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification regulations. *See* 45 C.F.R. § 162.920(a). HIPAA requires "covered entities" to comply with all HIPAA transaction standards, operating rules, and code sets. 45 C.F.R. §§ 160.103, 162.100. United is a "covered entity" as that term is defined in Title 45 of the Code of Federal Regulations. These regulations require that specifically defined electronic data sets be used to send and receive the medical claims data associated with healthcare encounters in the X12 5010 standard. The Department of Health and Human Services has adopted the following EDI data set standards by regulation:

46. *Eligibility and Benefits [270 and 271 transactions].* "The request transaction, known as the X12 5010 270 transaction for inquiries about eligibility and benefits, . . . can be sent from a healthcare provider to a health plan, or from one health plan to another[.] The response transaction, known as the X12 5010 271 transaction for health plan, responds to inquiries about eligibility/benefits[.]" *See Health Plan Eligibility and Benefits Transaction Basics*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/files/document/health-plan-eligibility-and-benefits-transaction-basics.pdf (last visited Oct. 15, 2026) ("These standards apply to all HIPAA-covered entities—health plans (including Medicare and Medicaid), clearinghouses, and certain

healthcare providers that conduct the adopted transactions electronically—not just those that work with Medicare or Medicaid.”).

47. *Payment / Invoicing / Coordination of Benefits [837 transaction].* The 837 file is the electronic invoice that the medical provider submits to the insurance company for reimbursement. The 837 file contains information on insurance claims and includes data about the patient’s treatments (such as the healthcare services delivered), the cost of medical care, and any modifications. This standard applies to all HIPAA-covered entities—health plans, clearinghouses, and providers. The 837 standard supports two options for conducting COB transactions: either between health plans and other payers, or from healthcare providers to health plans. *See Coordination of Benefits Transactions Basics*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/files/document/coordination-benefits-transactions.pdf (last visited Oct. 15, 2026).

48. *Claims Payment and Explanation [835 transaction].* The 835 is the digital transaction that delivers claim payment details from the insurer to the provider. The 835, like the 837, contains information such as what medical care is being covered, and for what amount. If the billed amount has been lowered or altered, then the 835 also contains an explanation for any such adjustment. The 835 also offers insurance details such as deductibles, co-pay amounts, healthcare claim splitting, co-insurers, and bundling. “The adopted standard for ERA [Electronic Remittance Advice] transactions is ASC X12 835 V5010[,]” which refers to “Accredited Standards Committee X12 Health Care Claim Payment/Remittance Advice (835), Version 005010X221 and its associated Errata Documents [], the standard for data content of the CCD+Addenda Record.” *EFT and ERA: Electronic Funds Transfer and Electronic Remittance Advice Transactions Basics*,

CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/files/document/electronic-funds-transfer-and-electronic-remittance-advice-transactions.pdf. (last visited Oct. 15, 2026).

49. As a covered entity, United must comply with the HIPAA regulations.

50. Consistent with the applicable regulations, United employed the X12 5010 standard transaction data sets when it processed Plaintiffs' employees' medical claims.

51. In addition to payors, *i.e.*, self-funded health plan and health insurance companies, and providers, Electronic Data Interchange ("EDI") clearinghouses play a critical role in enabling the electronic transmission of medical claims. *See United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 124 (D.D.C. 2022). "In 2021, 97 percent of medical claims were submitted electronically, and 95 percent of providers and 99 percent of insurers used EDI clearinghouses" to process those transactions. *Id.* at 125. "[A] substantial amount of medical claims data flows through EDI clearinghouses"—covering "the entire lifecycle of a claim—both pre- and post-adjudication." *Id.* "Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts"; "[p]ost-adjudicated claims data [ ] include[s] even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions." *Id.*

52. In practice, the medical claim submission and claim process works as follows: after a provider treats a patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form (professional) or CMS-1450 Health Insurance Claim Form (facility) is prepared. These forms are essentially a bill, invoice, or claim, prepared by the providers and submitted to United. In parallel, the information in these forms is usually translated into a specific,

regulation-required X12 5010 format EDI data, the 837-I or 837-P. As has become customary in the industry, providers transmit the EDI bill electronically to United.

53. United publishes Companion Guides that provide instructions for electronic communications and supplemental information for creating the required EDI data sets and transmitting and receiving them consistent with the regulatory requirements.

54. Once the forms or 837s are transmitted to the insurance company, the insurance company must acknowledge receipt within two days. If United accepts and processes the transaction (claim(s) and incurred charges), then it then generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim. An 835 is not a rejection of the claim. The 835 is then required to be transmitted to the provider's office and maintained by United in the standard or original format for auditability.

55. If United rejects a claim, then it does not generate an 835. Rather, it generates an EDI data record referred to as a "999" and transmits that to the provider's office. A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.

56. When a provider bills United for services or treatment, they follow the industry standard service and treatment codes, including Current Procedural Terminology ("CPT") codes, Diagnostic-Related grouping ("DRG") codes, and International Classification of Diseases ("ICD") codes, among others.

57. Despite requests from several Plaintiffs, as of the date of this complaint, United has not provided Plaintiffs or their authorized designee with the complete standard transaction data sets for the medical claims United processed that Plaintiffs were directed to pay. Certain Plaintiffs including Aramark and Grainger—received only partial data from United. Other Plaintiffs—

including Kraft Heinz, Ralph Lauren, and Sterling Jewelers—received no data, or only data that could not be meaningfully analyzed because United refused to produce the information in a workable format, provided incomplete information, or refused to authorize its release. United's failure to provide this information is alone a violation of its obligations.

58. [redacted]

59. [redacted]

[redacted]

60. Without this complete data, Plaintiffs cannot assess the full extent of United's mishandling of the Plans' assets and payment integrity performance. This is Plaintiffs' data and they have an absolute right to it. United's deliberate withholding and corruption of this data demonstrates that United prioritized its own interests, including concealing its mismanagement and self-dealing, over its duty of undivided loyalty to the Plans and Plan Participants.

**B. The Limited Data Made Available to Plaintiffs Confirms That United Breached Its Fiduciary Duties and the Standard of Care**

61. Plaintiffs paid United to properly adjudicate claims submitted for Plan Participant care. Yet United failed to do so, in violation of its fiduciary duties. As set forth above, United's fiduciary duty required it to use "care, skill, prudence, and diligence" in administering the Plans. 29 U.S.C. § 1104(a)(1)(B). This included properly reviewing claims before paying them with Plan assets, denying claims that did not satisfy eligibility requirements, and exercising the same level of scrutiny it applied to its own fully insured plans. United failed to satisfy this standard. United made millions of dollars in estimated overpayments for claims including, but not limited to, abusive billing practices, obvious payment errors, impossible pricing outliers, and non-covered services. These practices are discussed below.

**1. United Caused Plaintiffs to Pay Unreviewed High-Value Claims and Facially Defective Claims**

62. A basic claims administration function is to review the support underlying high-value claims—specifically medical records—before the claim is paid. United does this when high-value claims are submitted for payment to its fully insured plans when its own money is at risk. Upon information and belief, United routinely failed to do this for claims submitted for the care and treatment of Plaintiffs' Plan Participants.

REDACTED

63. [redacted]

64. Claims involving surgical procedures are among the costliest submitted to health plans and, as such, warrant heightened scrutiny to ensure they are medically necessary and properly documented. United regularly failed to review high-cost surgical claims, and paid, using the Plans' assets, thousands of claims involving misbilling of surgical procedures by the surgeon, the facility, or both. [redacted]

65. Similarly, United failed to exercise care and evaluate relevant documentation prior to approving claims (a) with unlisted or erroneous Current Procedural Terminology ("CPT") codes, (b) missing CPT codes, (c) missing or invalid diagnosis codes, (d) invalid or missing Diagnosis-Related Group ("DRG") codes, (e) invalid or missing revenue codes.[6] Claims with

[6] CPT codes out in a uniform format medical services and procedures performed by healthcare professionals. DRG codes standardize inpatient hospital stays by diagnosis, procedure, and patient demographics.

missing, invalid, invalid, or unlisted codes should not be paid without further review of supporting medical records or other documentation or requiring the healthcare provider to submit correct or "clean" claims. Absent or unrecognizable codes make it impossible to price the claim because United cannot determine what care or treatment the provider rendered.

66. A review of the limited data made available to Plaintiffs identified thousands of claims where United caused Plaintiffs to pay high-cost revenue claims worth tens of millions of dollars without medical review and that were missing necessary and required codes. A prudent fiduciary would have reviewed these claims before authorizing payment from Plan assets.

**2. United Caused Plaintiffs to Pay for Services Expressly Excluded from Plan Coverage**

67. United routinely approved claims for services the Plans did not cover. The Plans are generous in their coverage, but they contain specific exclusions and limitations. For example, the Plans do not cover untimely claims, cosmetic surgery, unnecessary telehealth services, and certain chiropractic services. Plaintiffs excluded such services from coverage based on United policies, benefit lan limitations, or specific circumstances such as investigational services, non-covered places of service, or because the services are generally not "medically necessary." United was aware of these limitations because, in many instances, United employees assisted Plaintiffs in preparing the governing summary plan descriptions provided to Plan Participants that identified treatments or procedures excluded from medical-insurance coverage. Based on the limited data available, United used Plan assets to pay for thousands of non-covered or out-of-policy services, including cosmetic surgery, massage therapy, "maintenance" care, and excluded vision services.

68. [redacted]

69. A review of just the limited data made available identified millions of dollars of claims where United paid for uncovered services. A prudent fiduciary would have denied these claims outright.

**3. United Caused Plaintiffs to Pay Facially Inconsistent Claims**

70. United is required to check claims across the claim population to ensure, among other things, that there are no inconsistent billings, duplicate claims, or double-billed claims. Based on the limited claim information available to Plaintiffs, it appears United failed to do this basic, industry-standard check when adjudicating Plaintiffs' claims. A prudent fiduciary would have flagged and denied such facially defective claims. A review of the limited data made available to Plaintiffs identified tens of thousands of inconsistent, duplicate, double-billed claims.

71. As one example, a facility received payment for duplicate charges for infusion services with no indication of a separate infusion for the date of service. These services were billed and paid twice for the same member and date of service on different claim IDs using the Plaintiff's Plan assets, resulting in an overpayment of more than [redacted].

72. United likewise approved and processed claims containing clear errors when compared with other claims for or associated with the same patient's treatment. Such examples include hospitals billing additional or add-on services or surgeries that the treating surgeon either did not perform or that are facially inconsistent with the surgeries and treatment the surgeon actually performed. Similarly, assistant surgeons often bill for services, surgeries, and treatment the primary surgeon did not perform or that are inconsistent with the surgeries and treatment the primary surgeon actually performed. There are instances where United approved payment of "assistant" surgeon claims when no corresponding claim for the "primary" surgeon exists. Such claims should be flagged for non-payment until the primary surgeon submits a claim, if ever. This type of cross-claim analysis is not limited to surgeries.

REDACTED

#### 4. United Caused Plaintiffs to Pay Unjustifiably High-Priced Claims and Unnecessary Claims

73. United's core function as Plaintiffs' TPA is to ensure that Plaintiffs do not pay unreasonable or unjustifiably expensive claims. A prudent fiduciary would exercise care to ensure that Plan assets are not wasted on overpriced or unnecessary services. United failed to do this, including the most basic of requirements, that Plaintiffs should not pay *more* than the amount the healthcare provider billed. While this seems axiomatic, even the limited data provided by United identifies hundreds of claims where United caused the Plans to pay more than the billed amount.

74. Similarly, Plaintiffs are expected to obtain the benefit of the provider discounts United claims to have negotiated with its participating providers, including United's contracted-for rates. United regularly approved claims at far higher amounts than the amounts the provider was regularly paid for the same services. United caused Plaintiffs to pay thousands of claims that were unjustifiably and indefensibly high, and, upon information and belief, higher than the amount United contracted to pay for its fully insured products. These include claims in which the provider billed and was paid prices well in excess of both Medicare and commercial in-network prices for the care rendered. United used Plan assets to pay the vast majority of these claims automatically, often within days, without any review by United. A review of the limited data made available to Plaintiffs identified thousands of excessively paid claims valued at millions of dollars.

75. Upon information and belief, many of these claims are likely associated with particular providers with whom United has explicit or informal agreements not to scrutinize their claims or to scrutinize only a limited number of the claims they submitted to United. Plaintiffs plead this on information and belief because United does not provide plaintiffs with provider agreements, chargemasters, or other participating provider pricing information.

### 5. United Failed to Provide Subrogation Services

76. [redacted].

77. [redacted]

### 6. United Failed to Protect Plaintiffs from Claims Reflecting Emergency-Room Abuse

78. United regularly paid claims for emergency room ("ER") visits that were improper and abusive. On average, a non-emergency ER visit costs 15 times more than a high-level office visit. Claims administration that shifts habitual ER users to providers' offices or urgent-care

centers would result in substantial cost reductions for Plaintiffs. [redacted].

79. [redacted]

80. [redacted]

### 7. United Engaged in Self-Dealing by Paying Its Own Affiliates More Than Non-Affiliates with the Plans' Funds

81. United engaged in self-dealing by using Plan funds to pay its affiliates or owned entities more than non-affiliates or independently owned entities. This conduct constitutes a prohibited transaction under ERISA because it involved dealing with Plan assets in United's own

interest and for its own account, in violation of 29 U.S.C. § 1106(b)(1), and because it constituted a transfer of Plan assets to or for the benefit of parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

82. Over the past decade, United Healthcare, through various wholly owned affiliates, has been acquiring large healthcare providers, including large surgical and physician practices, behavioral health practices, laboratory service providers, and ambulatory surgical centers. United Healthcare, through various subsidiaries, currently owns more than 2,500 such providers.

83. United consistently caused Plaintiffs to pay indefensibly high rates for services rendered by providers that United owns when compared to those services offered by independent providers. Upon information and belief, United engaged in the same self-dealing practices with respect to the Plans of all Plaintiffs. United's data limitations and concealment practices, as described herein, have prevented the Plaintiffs from conducting a robust comparative analysis.

84. United's practice of favoring its own affiliates is the subject of ongoing federal scrutiny. The Department of Justice's criminal healthcare-fraud unit, along with the Federal Bureau of Investigation and the Department of Health and Human Services' Office of Inspector General, is investigating United's billing practices. According to The Wall Street Journal, "[d]octors working for medical practices the company owns also added certain diagnoses at unusually high rates when treating UnitedHealth Medicare Plan Participants."[7] In 2021 alone, United received $8.7 billion for diagnoses that were not documented in treatment claims from doctors or hospitals—approximately half of all such payments industry-wide.[8] This criminal investigation is in addition to a civil investigation of Medicare billing practices and a probe of

[7] Christopher Weaver & Anna Wilde Mathews, *Prosecutors Question Doctors About UnitedHealth's Medicare Billing Practices*, WALL ST. J. (July 9, 2025).

[8] *Id.*

potential antitrust violations.[9] These federal investigations corroborate Plaintiffs' allegations that United's self-dealing practices extend beyond the Plans at issue in this case and reflect a broader pattern of prioritizing United's financial interests over those of its fiduciary clients. United's conduct in favoring its own affiliates at the Plans' expense violated ERISA's prohibition against fiduciary self-dealing and constitutes a prohibited transaction for which United is liable.

### C. United Engaged in Post-Adjudication Adjustments That Harmed Plaintiffs

#### 1. United Engaged in Cross-Plan Offsetting

85. United engaged in cross-plan offsetting while serving as TPA for Plaintiffs to Plaintiffs' detriment. As set forth above, United's duty of loyalty required it to act solely in the interest of the Plans and Plan Participants. Cross-plan offsetting violates this duty because United used Plan assets to benefit other plans, including United's own fully insured plans, rather than acting solely in the interest of the Plans that overpaid. United publishes its practice of cross-plan offsetting under the guise of "improv[ing] our self-insured customers' cash flow," when in fact cross-plan offsetting often benefits United and its own fully insured plan at the expense of self-funded plans like Plaintiffs.[10]

86. Cross-plan offsetting works as follows. United overpays a provider using funds from the Plans. Rather than collect the overpayment back from the provider, United "deducts" the overpaid amount from the next payment owed to the provider. Often, however, the "next" reduced payment comes from a different plan such that the reduced amount of the "next" payment does not benefit the plan United initially caused to overpay the provider. Instead, that "next" payment

---

[9] *Id.*

[10] *Update – UnitedHealthcare's Overpayment Bulk Recovery Process*, UNITEDHEALTHCARE, https://www.uhc.com/content/dam/uhcdotcom/en/Legal/PDF/Bulk-Recovery-Process.pdf (last visited Oct. 15, 2026).

comes from either another self-funded plan or, most frequently, one of United's fully insured plans. So, another self-funded plan or—in most cases—United itself gets the benefit of the reduced payment amount.

87. For example, Doctor X treats a patient covered by a Plan. Doctor X submits a claim for payment to United in the amount of $1,000. United reviews the claim and pays Doctor X $1,000 for the service. United later decides that it should have paid Doctor X $600. United does not ask Doctor X for a refund. Rather, United waits until Doctor X treats another patient covered by a United fully insured plan—rather than Plaintiffs' Plans. Doctor X submits a claim for payment to United for $1,000 for treating a second patient. United reviews the claim and decides Doctor X should be paid $600. Rather than paying Doctor X $600 for treating the second patient, United deducts the $400 overpayment on the first patient and pays Doctor X $200 for the second patient. United never refunds or credits Plaintiffs' Plans for the $400 that United initially overpaid for treating the first patient. In short, United uses cross-plan offsetting to get Plaintiffs' self-funded Plans to subsidize its fully insured book of business.

88. While United claims that self-insured plans benefit from cross-plan offsetting because "it provides individual plans access to a larger pool of outgoing payments from which to recover their overpayments," on information and belief, cross-plan offsetting does not benefit Plaintiffs.[11]

89. United does not hide that cross-plan offsetting benefits its fully insured plans. In fact, United boasts that cross-plan offsetting "helps UnitedHealthcare recover overpayments made on behalf of its fully insured plans."[12]

[11] *Id.*
[12] *Id.*

90. United benefits from cross-plan offsetting to the detriment of the Plans, in breach of United's fiduciary obligations to the Plans. United charges clients up to [redacted] of any credit recovery balance. [redacted]. In other words, when United "recovers" an overpayment via cross-plan offsetting, United charges and collects a portion of the overpayment "recovery" for itself rather than reimbursing the full amount of the overpayment, which United overpaid with Plaintiffs' funds in the first place, to Plaintiffs.

91. United's practice of cross-plan offsetting has already been held to present a "grave conflict of interest" where the administrator insures some but not all of the plans. *Peterson on behalf of Patients E, I, K, L, N, P, Q, & R v. UnitedHealth Grp. Inc.*, 242 F. Supp. 3d 834, 845 (D. Minn. 2017), *aff'd* 913 F.3d 769, 777 (8th Cir. 2019) (finding United's interpretation that a plan agreement impliedly permitted cross-plan offsetting was "not reasonable" because cross-plan offsetting "push[es] the boundaries of what ERISA permits" and noting that "[r]egardless of whether cross-plan offsetting necessarily violates ERISA, it is questionable at the very least"). The Eighth Circuit held that cross-plan offsetting was not authorized by plan documents and "is in tension with this [ERISA] fiduciary duty because it arguably amounts to failing to pay a benefit owed to a beneficiary under one plan in order to recover money for the benefit of another plan. While this benefits the latter plan, it may not benefit the former. It also may constitute a transfer of money from one plan to another in violation of ERISA's 'exclusive purpose' requirement." *Peterson*, 913 F.3d at 776-777.

92. The Eighth Circuit's decision in *Peterson* requires that plan documents clearly authorize United to engage in cross-plan offsetting. *Id.* at 776. United is aware of its mandate to do so. As a result of *Peterson*, United has made a concerted effort to persuade its clients to sign amendments to their respective agreements in which the plan specifically consents to United's continued use of cross-plan offsetting. However, this post-hoc consent (a) does United provide a clear explanation of cross-plan offsetting, (b) does not explain that cross-plan offsetting requires the misuse of Plan assets, (c) does not quantify the amount of the employer's Plan assets that will benefit another United fully insured plan or self-funded plan, and (d) does not provide Plaintiffs with an opportunity to affirmatively and knowingly consent to the practice. United's cross-plan offsetting practices demonstrate that United prioritized its own financial interests and those of its fully insured plans over its duty of undivided loyalty to Plaintiffs' Plans.

**2. United Took More from the Plans Than It Paid Out-of-Network Providers**

93. United obtained undisclosed fees from the Plans under false pretenses. This conduct violated United's duty of loyalty, which required United to act solely in the interest of the Plans and Plan Participants, and not to extract hidden fees for its own benefit. It also constitutes a prohibited transaction under ERISA because United received consideration for its own account from parties dealing with the Plans in connection with Plan transactions, in violation of 29 U.S.C. § 1106(b)(3). When United received a claim from an out-of-network provider, it frequently engaged a "repricing" company or companies to negotiate a lower amount that United ultimately paid the providers. United uses MultiPlan Corp. and its affiliates as a primary repricing company. On information and belief, United also uses other re-pricing companies in addition to MultiPlan Corp. and its affiliates.

94. The providers wanted to be paid—and should have been paid—for treating Plaintiffs' employees and their families. But United wanted to pay the providers as little as possible. The repricing companies had one job: delay payment until the provider's biller relented and agreed to accept an amount well below the billed amount and well below what United wrongfully obtained from the Plans. The repricing companies' plan worked. In 2018, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—for its 700+ customers that totaled $15.6 billion; in 2019, MultiPlan reported "savings" of $19.1 billion; in 2020, it reported "savings" of $18.8 billion; in 2021, it reported "savings" of $21.7 billion; in 2022, it reported "savings" of $22.3 billion; and in 2023, it reported "savings" of $22.9 billion.

95. United did not disclose to Plaintiffs that the repricing companies were subcontractors or that they were engaged in the claims adjudication and provider payment process.

96. United's use of repricing companies confirmed its practice of taking more funds from the Plans than it paid to providers. United's agreements with the repricing companies required United to pay them a percentage of the amount they "saved," *i.e.*, a bounty, on top of the fees United took as a percentage of the savings. Critically, United calculated the "savings" on the difference between the amount the provider billed and the amount (if any) the provider received. United did not disclose to plaintiffs that the "savings," would be calculated on the "billed" amount and the use of "billed" amount to calculate savings is completely improper and necessarily overstates any "savings" realized. As a matter of practice, United never pays out-of-network providers the amount billed, but determines some pre-allowed amount and, in some instances, the Plaintiffs' summary plan descriptions impose a concrete limit on the value of any out-of-network benefit, such as a multiple of the CMS published Medicare rate for each service or a percentile

range of the FairHealth published rates. Yet, United regularly charged plaintiffs for purported "savings" based on the unjustifiable amount the provider may have billed.

97. United paid the repricing companies from the excess funds it wrongfully obtained from the Plans. United did not pay the repricing companies, or itself, a "bounty" from its monthly per-employee fee. Rather, United extracted the "fee" for the repricing companies from the amounts it sought and obtained from Plaintiffs to pay provider medical claims.

98. Management and representatives of the repricing companies were aware that United acted as the Plans' TPA. Management and representatives of the repricing companies were aware that United paid its "bounty" or "success fee" from a United account or accounts that contained Plan assets. Management and representatives of the repricing companies were aware that United obtained money from the Plans before it knew how much a provider would ultimately be paid. Management and representatives of the repricing companies were aware that United did not refund, credit, or offset to the Plans' amounts that the repricing companies "saved."

99. United's use of repricing companies often resulted in Plaintiffs paying United, and in some cases MultiPlan, far more in "savings" fees or bounty than the doctor, surgeon, or other healthcare provider received for care rendered to Plaintiffs' employees. These fees are unreasonable and not permitted. Plaintiffs had no visibility into the total amount of these fees that they were paying to United (or the portion that United was paying to repricing companies) because it concealed these fees in claim funding requests or, if disclosed, were disclosed in gross, not at a claim level.

100. United further deceived Plaintiffs, and the Plan providers, through its "Shared Savings Plan." Under such plan, United is supposed to pay a Plan provider a reasonable amount for the services rendered discounted from the billed amount. The difference between the billed

amount and the negotiated, reasonable expense is the "savings." [redacted].

101. United, however, manipulates the Shared Savings Plan program [redacted] As a result, United collects a high fee from Plaintiffs, rather than a fee for saving the Plans money. It is common for United to collect *more* in the form of fees for refusing to pay than the doctor receives for caring for Plaintiffs' employees.

102. United's "Shared Savings Plan" was at issue in a 2021 jury trial in Nevada. A former United Healthcare executive testified that this was common—for the fees to exceed the payment to the provider—and United earned $1.8 billion in such fees in 2020. *Fremont Emergency Servs. (Mandavis) Ltd. et al. v. United Ins. Co. et al.*, Case #: A-19-792978-B (Nev. Dist. Ct., Clark Cnty.). Such fees are unreasonable, given that Plaintiffs are paying United to properly adjudicate and pay the claims in the first instance. By extracting these undisclosed fees from Plan assets, United prioritized its own financial interests over its duty of undivided loyalty to the Plans and engaged in prohibited transactions for which United is liable under 29 U.S.C. §§ 1106 and 1109.

**D. In Direct Violation of ERISA, United Commingled the Plans' Assets with Its Own Funds**

103. To make these schemes work, United moved funds from the Plans' accounts into United's own account containing United's funds and the funds of other plans. Because United is

an ERISA fiduciary, such commingling was not permitted. This commingling constitutes a prohibited transaction under ERISA because it involved the use of Plan assets by or for the benefit of a party in interest—United itself—in violation of 29 U.S.C. § 1106(a)(1)(D).

104. As a TPA and an ERISA fiduciary, United was supposed to make payments from an account owned and controlled by the Plans. United was supposed to write checks from or make ACH transfers from the Plans' accounts to a doctor or hospital that cared for a beneficiary of the Plans in keeping with its fiduciary duties prescribed by 29 U.S.C. § 1104(a)(1)(B).

105. In practice that did not happen. Instead, United commingled the Plans' funds with its own funds or the funds of other ERISA-governed Plans in violation of ERISA.[13] United directed the Plans to fund their accounts in certain bulk and undifferentiated amounts. United transferred funds from the Plans' accounts not to providers, but to an account or accounts owned and controlled by United or one of its affiliates. United then made payments to providers from the United account or accounts. The Plans had no access to these accounts, so it did not know—and had no way to determine—exactly how much the providers received for specific claims and whether that matched the amounts the Plans transferred to United for those specific claims. By commingling Plan assets with its own funds, United engaged in prohibited transactions for which it is liable under 29 U.S.C. §§ 1106 and 1109.

[13] United's comingling of Plaintiffs' funds also violated provisions of the contracts between certain of Plaintiffs and United. [redacted]

### E. United Applied Less Rigorous Claims Adjudication Standards to Self-Funded Plan Claims Than It Applied When Adjudicating Claims for Its Own Fully Funded Plans

106. United understands that, every year, "tens of billions of dollars are lost to healthcare fraud and abuse."[14] United acknowledged that "one-third of the $3.2 trillion spent on U.S. healthcare in 2015 was either fraudulent, waste and error or abusive."[15] "This loss directly impacts patients, taxpayers and the government through higher healthcare costs, insurance premiums and taxes."[16] "It can cause mistrust between doctors, patients and health care insurers."[17] "That's because in many cases, fraud and abuse involve harmful actions, like getting prescriptions for the wrong medications, receiving improper medical services and being misguided by needless tests and diagnoses."[18]

107. As set forth above, United's duty of loyalty required it to act solely in the interest of the Plans and Plan Participants, and United's duty of prudence required it to use "care, skill, prudence, and diligence" in administering the Plans. United breached both duties by applying less rigorous claims adjudication standards to self-funded plans like Plaintiffs' than it applied to its own fully insured plans.

108. United applies rigorous standards for accepting, processing, and paying claims submitted to its fully insured plans where United is paying claims with its own money. As a result of applying these rigorous standards, United has a high rejection rate for claims submitted to its

---

[14] *Health Care Fraud: Frequently Asked Questions*, UNITEDHEALTHCARE, https://www.uhc.com/fraud/faqs (last visited October 15, 2026).
[15] *Payment Integrity*, UNITEDHEALTHCARE, https://www.uhc.com/content/dam/uhcdotcom/en/BrokersAndConsultants/payment-integrity-sell-sheet.pdf (last visited Oct. 15, 2026).
[16] *Health Care Fraud: Frequently Asked Questions*, UNITEDHEALTHCARE, https://www.uhc.com/fraud/faqs (last visited Oct. 15, 2026).
[17] *Id.*
[18] *Id.*

fully funded plans for payment. Yet, on information and belief, United did not apply fraud-prevention investigations, techniques, or technology to identify and prevent the payment of fraudulent or otherwise improper claims made to the Plans as stringently as it does to similar claims made to United's own insurance plans. When United is not responsible for paying claims with its own money and instead pays claims with money from self-funded plans, like the Plans, United applies less rigorous standards for accepting, processing, and paying claims submitted for payment. On information and belief, as a result of the thousands of improperly adjudicated and paid Plaintiffs' claims, the claim-rejection rate for a self-funded plan, generally was—and is—lower than the rate for United's fully insured plans.

109. As an ERISA fiduciary, United was required to treat claims submitted to the Plans like it treats claims submitted to its fully insured plans. By prioritizing its own assets and resources to the detriment of the Plans, United breached its fiduciary duty to the Plans. [redacted]. United's failure to employ these fraud-prevention investigations, techniques, and technology adequately, or do so as stringently as it does with claims made to its own insurance programs, violated its fiduciary duties owed to Plaintiffs. United's disparate treatment of the Plans demonstrates that United prioritized its own financial interests over its duty of undivided loyalty to the Plans and failed to exercise the care, skill, prudence, and diligence required of a fiduciary under ERISA.

**F. United Used Exclusion Lists to Limit the Scrutiny Applied to Plaintiffs' Claims**

110. United employs a tactic, strategy, or procedure involving "exclusion lists." To induce providers to join United's network of providers and enter "in-network" agreements, and perhaps for other reasons, United agrees to place providers on "exclusion lists." A provider on

REDACTED

this list benefits because being on this list commits United to providing no scrutiny or limited scrutiny of the claims those providers submit for reimbursement. Or it commits United to scrutinize and properly adjudicate only a small number or a small percentage of the claims the listed provider submitted for adjudication.

111. Discovery will show that United used exclusion lists and consequently applied limited scrutiny to certain claims for which Plaintiffs ultimately paid. [redacted]

112. At no point did United disclose the use of exclusion lists to Plaintiffs. Nor did it disclose that claims for payment submitted to United related to the care and treatment of Plaintiffs' employees would not be reviewed or scrutinized.

**G. United Actively Concealed Its Misconduct and Prevented Plaintiffs from Discerning Whether United Correctly Processes Medical Claims**

113. United took affirmative steps to conceal its improper siphoning of Plans' funds and prevents its customers, like Plaintiffs, from having visibility into United's claim processing practices. As set forth above, United's duty of loyalty required it to act solely in the interest of the Plans and Plan Participants. United breached this duty by actively concealing information that would have revealed United's self-dealing and misuse of Plan assets.

114. United likewise misrepresented and actively concealed the fees it was charging the Plans in its summary invoices provided pursuant to the Agreements. United misrepresented the fees it charged the Plans because United knew the fees were improper and it wanted to prevent Plaintiffs from uncovering its scheme.

115. United's affirmative misrepresentations and active concealment effectively hid its misconduct and prevented Plaintiffs from discovering the alleged misconduct.

REDACTED

116. [redacted]

117. United places further restrictions on Plaintiffs' ability to conduct full audits. Specifically:

a. [redacted]

b. [redacted]

c. [redacted]

d. [redacted]

118. In other words, United deprived the Plans of any visibility into, much less a remedy for, any improperly processed but unaudited claims. The specific examples above demonstrate the patterns of misconduct that can be identified from a comprehensive review of the claims data that cannot be discerned from a bare bones review of a few hundred claims.

119. Because the claims are unique, not homogenous, the restrictive audits shed no light on the unaudited claims, and the agreements prohibit extrapolation of the results across the claim population without United's approval. On information and belief, United conducted a comprehensive claim review for its own fully insured book of business and has retained third-party payment integrity firms to assist it with those reviews. United prevented Plaintiffs from exercising those options.

120. United's pattern of concealment prevented Plaintiffs from discovering that United failed to comply with duties and obligations that United owed to Plaintiffs. United's conduct included:

a. Not providing Plaintiffs access to the complete X12 medical claims data, despite the fact that the medical claims data belongs to Plaintiffs;

b. Not disclosing or not adequately obtaining informed consent regarding United's practice of cross-plan offsetting;

c. Not disclosing that, as a result of separate contractual agreements with United, certain providers of medical services were not subject to review for overpayment or audit;

d. Not disclosing, or otherwise identifying, claims as subrogation eligible or those to which a third party had primary responsibility, but were not pursued at the discretion of United;

e. Not disclosing, or otherwise identifying, claims that were likely overpayments that were not pursued or otherwise addressed at the discretion of United; and

f. Not disclosing information sufficient for Plaintiffs to identify claims that should have never been paid, but which United paid in the first instance, only to "recover" those distributions as overpayments, along with an overpayment recovery fee.

121. The Consolidated Appropriations Act ("CAA") of 2021 added section 408(b)(2)(B) to ERISA, which requires covered service providers to ERISA group health plans to provide

REDACTED

advance written disclosures of all direct and indirect compensation reasonably expected in connection with any contract entered into, renewed, or extended on or after December 27, 2021.

122. United failed to provide Plaintiffs' Plan fiduciaries with compliant disclosures as required by this provision, including but not limited to undisclosed savings or repricing fees, overpayment and subrogation fees, payments from repricing vendors, interest earned on Plan funds, and payments to or from affiliates and third parties connected to Plan claims, networks, or other services.

123. [redacted]. [redacted]

124. Notwithstanding these extensions after the CAA disclosure requirement effective date, Defendants failed to provide this required disclosure, thereby rendering these extended agreements not reasonable. ERISA § 408(b)(2)(B) ("No contract or arrangement for services

between a covered plan and a covered service provider, *and no extension or renewal of such a contract* or arrangement, is reasonable within the meaning of this paragraph unless the requirements of this clause are met." (emphasis added)).

125. Congress enacted this provision specifically to address a pervasive lack of transparency in the compensation arrangements between ERISA group health plans and their service providers, which is the very kind of opacity that United has exploited here. The disclosure obligation is broadly drawn: it encompasses not only fees paid directly by the plan, but also indirect compensation from any source reasonably connected to the service arrangement, including payments received from third-party vendors, affiliates, and other intermediaries. By mandating advance written disclosure of these compensation streams, the CAA ensured that plan fiduciaries would have the information necessary to evaluate whether their service providers' arrangements are reasonable: an evaluation that United's concealment made impossible

126. Defendants' failure to provide the required disclosure further evidences Defendants' efforts to conceal their misconduct. United's pattern of concealment demonstrates that United prioritized its own financial interests over its duty of undivided loyalty to the Plans and Plan Participants.

## CLAIM ONE

### Breach of Fiduciary Duty Under ERISA
### (29 U.S.C. §§ 1104(a) and 1109(a))

127. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

128. Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as an ERISA fiduciary.

129. As the claims administrator to the Plans, United was an ERISA fiduciary and thus owed the Plans, Plan Participants, and Plaintiffs a fiduciary duty to discharge its obligations to the Plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

130. United also owed a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Plans' documents. *See* 29 U.S.C. § 1104(a)(1)(D).

131. United breached its fiduciary duties as set forth herein.

132. United further breached its fiduciary duties by approving claims for benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

133. United further breached its fiduciary duty by not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims.

134. United's breach of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims with Plan assets. These losses were ultimately suffered by Plaintiffs.

135. United profited an undetermined amount due to its breach of its fiduciary duties.

136. Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from United's breach of its fiduciary duty, (ii) the recovery of any and all benefit or profits United made as a result of its breach of its fiduciary duty, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM TWO

### Prohibited Transactions Under ERISA
### (29 U.S.C. §§ 1106(a)(1)(D), 1132(a)(2), and 1109(a))

137. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

138. Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(a)(1)(D), and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as an ERISA fiduciary.

139. United was an ERISA fiduciary to the Plans, Plan Participants, and Plaintiffs.

140. The healthcare providers and other parties to whom United made payments pursuant to claims for health benefits that it approved are "parties in interest" under ERISA because they provided or purported to provide "services" to the Plans.

141. By approving and paying fraudulent or otherwise improper or uncovered claims to such parties in interest, United engaged in "prohibited transactions" by causing the Plans to engage in transactions that United either knew or should have known constitute a direct or indirect transfer to or use by or for the benefit of a party in interest of assets of the Plans.

142. Neither the Plans nor Plaintiffs in their role as sponsors of their respective Plans received adequate consideration for the amounts that were paid for these prohibited transactions.

143. In addition, United retained for itself and transferred to itself monies from the Plans to which it had no lawful right. United further transferred some portion of Plans' money wrongfully retained or obtained to its affiliates, to its subcontractors, and to other third parties as compensation for their participation in the scheme, pattern and practices employed by United to obtain and retain monies from the Plans to which it had no lawful right.

144. Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from United having engaged in prohibited transactions, (ii) the recovery of any and all benefit or profits United made as a result of having engaged in prohibited transactions, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

**CLAIM THREE**

**Breach of Fiduciary Duty Under ERISA**
**(29 U.S.C. §§ 1106(b)(1) and 1109(a))**

145. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

146. Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(b)(1), and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as an ERISA fiduciary.

147. As claims administrator for the Plans, United was a fiduciary under ERISA, and thus owed fiduciary duties to Plaintiffs. ERISA forbids a fiduciary from engaging in self-dealing. *See* 29 U.S.C. § 1106(b)(1).

148. United controlled the adjudication, pricing, repricing, reprocessing, and payment of healthcare provider claims through an adjudication process.

149. As a fiduciary, United was required, among other things, to discharge its duties solely in the interest of Plan Participants and beneficiaries of the Plans or to Plaintiffs, to preserve the Plans' assets, and to fully disclose its actions and any compensation it was taking for its services.

150. As set forth herein, United breached its fiduciary duties by engaging in a variety of wrongful acts and practices.

151. Additionally, United made profits of an undetermined amount due to its breach of duty of loyalty and care.

152. Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from United's breach of its fiduciary duty, (ii) the recovery of any and all profits or benefit that United made as a result of its breach of its fiduciary duty, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

**CLAIM FOUR**

**Prohibited Transactions Under ERISA**
**(29 U.S.C. §§ 1106(b)(3) and 1109(a))**

153. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

154. Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3) and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as an ERISA fiduciary.

155. As claims administrator for the Plans with discretion over Plan administration and Plan assets, United was a fiduciary under ERISA. As a fiduciary, United was prohibited from "receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *See* 29 U.S.C. § 1106(b)(3).

156. By retaining the difference between the negotiated price for medical services rendered and the monies withdrawn from the Plans and collecting "savings" and "reprocessing" fees, United received consideration from parties transacting with the Plan constituting "prohibited transactions." Among other things, United used its control of Plan assets, the negotiation of the price paid for medical services, and the engagement of "repricing" companies to improperly receive and retain monies from the Plans.

157. United retained for itself and transferred to itself monies from the Plans to which it had no lawful right.

158. Neither the Plans nor Plaintiffs received adequate consideration for the amounts that were paid for these prohibited transactions.

159. Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from United having engaged in prohibited transactions, (ii) the recovery of any and all profits that United made as a result of having engaged in prohibited transactions, (iii) all such other equitable or remedial relief as the court may deem appropriate, and (iv) the recovery of Plaintiffs' attorney's fees and costs.

## CLAIM FIVE

### Prohibited Transactions for Failure to Meet ERISA § 408(b)(2) Reasonable Contract/Disclosure Requirements for Group Health Plans

160. Plaintiffs reallege and incorporate all prior paragraphs.

161. ERISA § 406(a) generally prohibits a plan from transferring assets to, or using assets for the benefit of, a party in interest, including service providers.

162. ERISA § 408(b)(2) exempts only those service arrangements that are necessary, have a reasonable contract or arrangement, and pay no more than reasonable compensation. The Consolidated Appropriations Act of 2021 added section 408(b)(2)(B) for ERISA group health plans, requiring covered service providers to give advance written disclosures of all direct and indirect compensation for any contract entered into, renewed, or extended on or after December 27, 2021.

163. Without compliant disclosures, the arrangement is not "reasonable," and the exemption does not apply.

164. Plaintiffs' Plans are ERISA group health plans. Defendants, including United and its affiliates, are parties in interest and covered service providers because they provided third-party administration and related services to the Plans for compensation under contracts entered into, renewed, or extended on and after December 27, 2021.

165. Defendants failed to provide Plaintiffs' Plan fiduciaries with compliant written disclosures of all direct and indirect compensation reasonably expected in connection with those post-December 27, 2021, arrangements, including compensation they received from third parties, and failed to timely update such disclosures upon material changes.

166. The undisclosed compensation included savings or repricing fees, overpayment and subrogation fees, payments from repricing vendors, interest earned on funds that belonged to the Plans, and payments to affiliates related to Plan business, and payments or other compensation received from third parties connected to Plan claims, networks, repricing, or other services.

167. Because Defendants did not provide compliant ERISA § 408(b)(2)(B) disclosures, the contracts and arrangements were not "reasonable" under section 408(b)(2), the exemption is unavailable, and each payment of compensation to Defendants under those arrangements constitutes a prohibited transaction under ERISA § 406(a).

168. Additionally, to the extent Defendants exercised authority or control over Plan assets or discretion over pricing, recoveries, or "savings," they acted as fiduciaries and engaged in self-dealing and other fiduciary breaches by receiving and retaining undisclosed or unreasonable compensation, in violation of ERISA §§ 406(b) and 404.

169. Defendants' prohibited transactions and fiduciary misconduct caused losses to the Plans and unjustly enriched Defendants, who received and retained compensation to which they were not entitled.

170. Plaintiffs seek a declaration that the challenged payments are prohibited transactions, restitution, injunctive and other equitable relief, and attorneys' fees, costs, and further appropriate relief under ERISA §§ 409 and 502(a)(2), (a)(3).

**CLAIM SIX**

**Breach of Contract**

171. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

172. Pursuant to each of the Agreements between United and Plaintiffs, United had the obligation to approve and pay only those claims that are both legitimate and satisfy the requirements of the Plans and deny all other claims.

173. Additionally, United had a duty to deny claims for health benefits that contained indicia of fraud until it determined (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

174. United breached its contractual obligations by failing to take steps, or to take adequate steps to ensure that fraudulent or otherwise improper claims for health benefits were identified and not paid.

175. United breached its contractual obligations by approving and paying claims for health benefits that were fraudulent or otherwise improper.

176. United further breached its contractual obligations by approving claims for health benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

177. United further breached its contractual obligations by not recovering, or seeking to recover, all amounts that were "overpaid" pursuant to fraudulent or otherwise illegitimate claims for health benefits.

178. United's breaches of its contractual obligations resulted in millions of dollars in improper payment of fraudulent or otherwise illegitimate claims on behalf of the Plan.

179. It also resulted in Plaintiffs making contributions to their Plan that they otherwise would not have been required to make, thereby losing the use of the funds for other purposes.

180. Plaintiffs fully performed under the Agreement.

181. Accordingly, Plaintiffs seeks to recover all losses that they have suffered due to United's breaches of its contractual obligations, as well as Plaintiffs' attorney's fees.

**CLAIM SEVEN**

**Declaratory Relief**

182. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

183. HIPAA regulations require that an Electronic Remittance Advice ("ERA") or an "835," is required to be transmitted to the provider's office and maintained by United in the standard or original format for auditability. As a covered entity, United should have complied with the HIPAA regulations.

184. United did not provide Plaintiffs with the 835s for the medical claims United processed despite United agreeing to make available claim data, claim settlements and periodic reports at no additional charge as per the Agreements. United has failed to satisfy its contractual obligations to provide requested claims data.

185. Without this data, the Plans were unable to assess United's handling of the Plan's funds and associated payment integrity. The Plans own this data and have an absolute right to it.

186. Accordingly, pursuant to ERISA § 502(a)(3), Plaintiffs seek appropriate equitable relief in the form of a declaration ensuring that an employer, Plan sponsor, or trust (if applicable)

or appropriate designee (bound by any requirements respecting HIPAA-protected information) shall have access to any 835 or ERA regarding any Plan Participant healthcare encounter.

187. Alternatively, Plaintiffs seek a declaration under ERISA § 502(a)(3) that United breached its contractual obligations by not providing Plaintiffs with 835 files, and an order directing United to provide Plaintiffs with complete versions of such files.

**CLAIM EIGHT**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

188. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

189. Included in the Agreements between United and Plaintiffs was an implied covenant of good faith and fair dealing.

190. Pursuant to that implied covenant, United had an obligation not to approve or pay claims for health benefits that were fraudulent or otherwise illegitimate.

191. Further, United had an obligation to deny claims for health benefits that contained indicia of fraud until it determined (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by Plans.

192. United also had an obligation to recover any amounts that were paid pursuant to fraudulent or otherwise illegitimate claims.

193. United breached its contractual obligations by failing to take steps, or to take adequate steps to ensure that fraudulent or otherwise improper claims for health benefits were identified and not paid.

194. United further breached its obligations by approving and paying claims for health benefits that were fraudulent or otherwise illegitimate, approving claims with indicia of fraud

without first determining that the claims were legitimate, non-fraudulent and covered by the Plans, and by failing to pursue recovery of all amounts paid pursuant to fraudulent or otherwise illegitimate claims.

195. United's breaches of its obligations resulted in millions of dollars in improper payment of fraudulent or otherwise illegitimate claims by Plaintiffs on behalf of the Plans.

196. It also resulted in Plaintiffs making contributions to the Plans that they otherwise would not have been required to make, thereby losing the use of the funds for other purposes.

197. Plaintiffs fully performed under the Agreement.

198. Accordingly, Plaintiffs seek to recover all losses that they have suffered due to United's breach of the implied covenant of good faith and fair dealing.

**CLAIM NINE**

**Breach of Fiduciary Duty**

199. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

200. In the alternative to the ERISA claims asserted above, Plaintiffs assert a breach of fiduciary duty claim under the common law.

201. As claims administrator for the Plans, United owed the Plans, Plan Participants, and Plaintiffs fiduciary duties of loyalty and care.

202. United breached its fiduciary duties by failing to take steps, or to take adequate steps to ensure that fraudulent or otherwise improper claims for health benefits were identified and not paid.

203. United further breached its fiduciary duties by approving and paying claims for health benefits that were fraudulent or otherwise improper.

204. United further breached its fiduciary duties by approving claims for health benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

205. United further breached its fiduciary duties by not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims.

206. United's breaches of its fiduciary duties resulted in millions of dollars in improper payment of fraudulent or otherwise improper claims by Plaintiffs on behalf of the Plans. These losses were ultimately suffered by Plaintiffs, which were forced to make contributions to the Plans that it otherwise would not have had to make.

207. Additionally, United made profits of an undetermined amount due to its breach of its duties of loyalty and care.

208. Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from United's breach of its fiduciary duties, (ii) the recovery of any and all profits that United made as a result of its breach of its fiduciary duties, (iii) all such other equitable or remedial relief as the court may deem appropriate, and (iv) the recovery of Plaintiffs' attorney's fees and costs.

## CLAIM TEN

## Negligence

209. Plaintiffs reallege and incorporates by reference each and every allegation contained herein.

210. As claims administrator for the Plans, United owed the Plans, Plan Participants, and Plaintiffs a duty not to approve or pay claims for health benefits that were fraudulent or otherwise illegitimate.

REDACTED

211. Further, United had a duty to deny claims for health benefits that contained indicia of fraud until it determined (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

212. It also had a duty to recover any amounts that were paid pursuant to fraudulent or otherwise illegitimate claims.

213. [redacted]

214. United breached these duties by negligently (i) failing to take steps, or to take adequate steps to ensure that fraudulent or otherwise improper claims for health benefits were identified and not paid, (ii) approving and paying claims for health benefits that were fraudulent or otherwise illegitimate, approving, (iii) approving and paying claims for health benefits with indicia of fraud without first determining that the claims were legitimate, non-fraudulent and covered by the Plans, and (iv) failing to pursue recovery of all amounts paid pursuant to fraudulent or otherwise illegitimate claims.

215. United's negligence resulted in millions of dollars in improper payment of fraudulent or otherwise illegitimate claims by Plaintiffs on behalf of the Plans.

216. It also resulted in Plaintiffs making contributions to the Plans that they otherwise would not have been required to make, thereby losing the use of the funds for other purposes.

217. Accordingly, Plaintiffs seek to recover all losses that they have suffered due to United's negligence.

REDACTED

**CLAIM ELEVEN**

**Gross Negligence**

218. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

219. As claims administrator for the Plans, United owed the Plans, Plan Participants, and Plaintiffs a duty not to approve or pay claims for health benefits that were fraudulent or otherwise illegitimate.

220. Further, it had a duty to deny claims for health benefits that contained indicia fraud until it determined (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

221. It also had a duty to recover any amounts that were paid pursuant to fraudulent or otherwise illegitimate claims.

222. [redacted]

[redacted].

223. United breached these duties as its acts or omissions caused an extreme degree of risk to Plaintiffs, a degree of risk United was consciously aware of. For example, United (i) failed to take steps, or to take adequate steps to ensure that fraudulent or otherwise improper claims for health benefits were identified and not paid, (ii) approved and paid claims for health benefits that were fraudulent or otherwise illegitimate, (iii) approved and paid claims for health benefits with indicia of fraud without first determining that the claims were legitimate, non-fraudulent and covered by the Plans, and (iv) failed to pursue recovery of all amounts paid pursuant to fraudulent or otherwise illegitimate claims.

224. United, one of the largest and most sophisticated TPAs in the nation, knows the extreme degree of risk posed to Plaintiffs by approving fraudulent or otherwise illegitimate medical claims without review. By approving these claims without review, United did not perform its claims processing obligations with [redacted] In so doing, United demonstrated its conscious indifference to the extreme degree of risk of approving fraudulent or otherwise illegitimate claims.

225. United's gross negligence resulted in millions of dollars in improper payment of fraudulent or otherwise illegitimate claims by Plaintiffs on behalf of the Plans.

226. It also resulted in Plaintiffs making contributions to the Plans that it otherwise would not have been required to make, thereby losing the use of the funds for other purposes.

227. Accordingly, Plaintiffs seek to recover all losses that they have suffered due to United's gross negligence.

**CLAIM TWELVE**

**Unjust Enrichment**

228. Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

229. Pursuant to each of the Agreements between United and Plaintiffs, Plaintiffs paid United a monthly fee to properly adjudicate claims for health benefits under the Plans.

230. In exchange for that monthly fee, United had an obligation not to approve or pay claims for health benefits that were fraudulent or otherwise illegitimate.

231. Further, it had an obligation to deny claims for health benefits that contained indicia of fraud until it determined (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

232. United also had an obligation to recover any amounts that were paid pursuant to fraudulent or otherwise illegitimate claims.

233. In violation of its obligations, United failed to take steps, or to take adequate steps to ensure that fraudulent or otherwise improper claims for health benefits were identified and not paid. United further approved and paid claims for health benefits that were fraudulent or otherwise illegitimate. United also approved claims with indicia of fraud without first determining that the claims were legitimate, non-fraudulent and covered by the Plans. And, United failed to make any efforts to recover amounts that were "overpaid" pursuant to fraudulent or otherwise illegitimate claims for health benefits.

234. As a consequence, Plaintiffs suffered millions of dollars in losses, and United earned millions of dollars in fees and profits.

235. It would be inequitable to permit United to retain any fees or profits that it earned while approving fraudulent or otherwise illegitimate claims.

236. Accordingly, Plaintiffs seek the (i) recovery of any and all fees and/or profits that United made as a result of its breach of its fiduciary duties, and (ii) all such other equitable or remedial relief as the court may deem appropriate.

**JURY TRIAL DEMAND**

Plaintiffs request and demand a trial by jury on any claims, defenses, or issues properly triable before a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court issue a final judgment:

a. Ordering United to reimburse Plaintiffs for any and all losses resulting from Defendants breaching their fiduciary duties and/or having engaged in prohibited transactions;

b. Ordering United to disgorge to Plaintiffs any and all profits that United made as a result of their breaches of fiduciary duties and/or having engaged in prohibited transactions;

c. Granting a preliminary injunction compelling United to provide all Plan claims data (subject to appropriate privacy protections);

d. Ordering United to identify Plan sponsor, employer, or trust (if applicable) and taxpayer identification number (or "TIN") in any 835 or Electronic Remittance Advice transmitted directly to any healthcare provider or to any clearinghouse, including Change Healthcare (a United affiliate);

e. Ordering a preliminary injunction ensuring that an employer, Plan sponsor, or trust (if applicable) or appropriate designee (bound by any requirements respecting HIPAA-protected information) shall have access to any 835 or Electronic Remittance Advice regarding any Plan Participant healthcare encounter;

f. Ordering United to pay Plaintiffs their attorneys' fees and costs;

g. Awarding punitive damages; and

h. Granting all such other relief as the Court may deem proper and just.

Dated: October 20, 2026

*/s/ Jennifer Truelove*
Jennifer Truelove
Texas Bar No. 24012906
**MCKOOL SMITH, P.C.**
jtruelove@mckoolsmith.com
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: 903-923-9000
Telecopier: 903-923-9099

David I. Schiefelbein
New York State Bar No. 4767398
dschiefelbein@mckoolsmith.com
Eric B. Halper
New York State Bar No. 3048360
ehalper@mckoolsmith.com
**MCKOOL SMITH, PC**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Jon Corey
D.C. Bar No. 491311
jcorey@mckoolsmith.com
**MCKOOL SMITH, PC**
1717 K Street NW, Suite 1000
Washington, D.C. 20006
T: (202) 370-8300
F: (202) 370-8344

Robert M. Manley
Texas State Bar No. 787955
rmanley@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1200
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

***Attorneys for Plaintiffs***
*Aramark Services, Inc.*
*Aramark Uniform And Career Apparel, Inc.*
*Aramark Employee Welfare Benefit Plan*
*Aramark Uniform Services Employee Welfare Benefit Plan*
*Aramark Uniform Services Health and Welfare Plan*
*Aramark Services, Inc. Group Health Plan*
*Aramark Benefits Compliance Review Committee*
*W.W. Grainger, Inc.*
*W.W. Grainger, Inc. Group Benefit Plan I*
*W.W. Grainger, Inc. Group Benefit Plan II*
*Kraft Heinz Foods Company*
*Kraft Heinz Company Group Benefits Plan*
*Kraft Heinz Company Retiree Group Benefits Plan*
*The Kraft Heinz Company Employee Benefits Administration Board*
*Ralph Lauren Corporation*
*Ralph Lauren Corporation Employee Benefit Plan*
*Sterling Jewelers, Inc.*
*Sterling Jewelers, Inc. Employee Benefit Plan*
*Whirlpool Corporation*
*Whirlpool Corporation Welfare Benefits Committee*
*Whirlpool Corporation Group Benefit Plan*
*Whirlpool Corporation Group Benefit Plan for Retirees*

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that a Motion to Seal this document has been filed.

/s/ Jennifer Truelove
Jennifer Truelove